**Manohar SINGH, Plaintiff,**

v.

**Charles A. BOWSHER, Comptroller General, General Accounting Office, Defendant.**

**Civ. A. No. 82–2173.**

United States District Court, District of Columbia.

Dec. 21, 1984.

John D. Bates, Asst. U.S. Atty., Washington, D.C., for defendant.

Lawrence J. Sherman, Washington, D.C., for plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUBREY E. ROBINSON, Jr., Chief Judge.

### FINDINGS OF FACT

1. Plaintiff, Manohar Singh, Ph.D., is an employee of the United States General Accounting Office (GAO). He occupies a position as an Evaluator, series 347, GS–14, step 7, in the Resources, Community and Economic Development Division (RCED). RCED was formerly known as CEDD: hereinafter it will be referred to as RCED/CEDD.

2. The race of Plaintiff is Indo-Aryan; his national origin is Burmese; his color is brown and his religion is Sikh.

3. In this action, brought under Title VII of the 1964 Civil Rights Act as amended, 42 U.S.C. § 2000e *et seq.*, Plaintiff alleges that his repeated failure to be promoted to a GS–15 position, once in 1978, three times in 1979 and twice in 1980, has been the result of racial and religious discrimination and retaliation as manifested in decisions relating to awards, travel, performance appraisals, harassment for charitable contributions and the handling of his administrative complaint.

4. Plaintiff was originally hired by GAO in 1976 pursuant to the settlement of an administrative complaint. Filed on July 9, 1975, the administrative complaint arose out of an interview for a GS–15 position with GAO in which Mr. Richard Gutmann commented upon the fact that Plaintiff was wearing a turban. Additionally, Mr. Gutmann incorrectly informed Plaintiff that if, in fact, he left his previous agency to join GAO he would be required to serve a second probationary period within the federal government.

5. The complaint was investigated and the settlement arranged by the Director of GAO's Civil Rights Office, Mr. Alexander Silva. Mr. Silva had no professional or personal contact with the Plaintiff following the settlement of the administrative complaint in 1976 until 1980 when Dr. Singh filed a second administrative complaint with the Civil Rights Office.

6. Dr. Singh first joined GAO as a Supervisory General Engineer, job series 801, GS–14, step 3, in the Science and Technology Subdivision of the Procurement and Systems Acquisition Division (PSAD). PSAD was later redesignated Mission Analysis and Systems Acquisition Division and will be referred to hereinafter as PSAD/MASAD.

7. On April 9, 1978, Dr. Singh was transferred from the Science and Technology Subdivision of PSAD/MASAD to the Systems and Analysis Staff of the Director of PSAD/MASAD to serve as a Supervisory General Engineer, series 801. The Systems and Analysis Staff is responsible for providing technical advice and expertise to aid generalists from various GAO areas in their performance of specific projects.

8. On July 26, 1981, at his request, Plaintiff was transferred from PSAD/MASAD altogether into RCED/CEDD. He was assigned to and has remained in his

present position as an Evaluator, GS–14, step 7.

9. Plaintiff's immediate supervisor from July 26, 1976 until November 19, 1977 was Chester Daniels. Joe Johnson followed Mr. Daniels as Plaintiff's immediate supervisor from November 1977 until April 9, 1978. Plaintiff's second level supervisor during this period was Donald Day, Senior Assistant Director of the Science and Technology Subdivision. Plaintiff's immediate supervisor from April 1978 until his transfer from PSAD/MASAD in July 1981 was Dr. John Barmby.

10. When Dr. Singh began employment with GAO in 1976, the Director of PSAD/MASAD was Richard Gutmann. In June 1978 Jerome Stolarow took over the position as Director. Mr. Stolarow was replaced by Walton Sheley in June 1980. Mr. Sheley was Director of PSAD/MASAD from June 1980 until April 1983.

11. Between 1978 and 1980, Plaintiff submitted complete applications for five (5) GS–15 positions within GAO. The GS–15 positions were all titled Supervisory Management Analyst, series 343. These five positions were described in the following Job Opportunity Announcements (JOA) and submitted on the dates indicated:

| JOA | DATE SUBMITTED |
|---|---|
| 78–329 | January 3, 1978 |
| 79–1006 | August 20, 1979 |
| 80–1082 | December 21, 1979 |
| 80–1160 | February 28, 1980 |
| 80–1190 | March 28, 1980 |

In lieu of a complete application for a sixth GS–15 position, JOA 79–1050, Dr. Singh submitted to the GAO personnel office a copy of a performance appraisal and the job announcement for the position.

*Competitive Selection*

12. In order to apply for an open position through the competitive selection process within GAO, an employee applicant must submit to the personnel office (his Personal Qualification Statement") GAO Form 537, similar to the standard civil service Form 171. He must submit a copy of his most recent evaluation form, GAO Form 503, "Supervisory Appraisal of Po-

tential." A Form 503 may be used for to one year for applications involving the same job qualifications. Finally, an applicant is required to submit a GAO Form 501, "Vacant Position Application," a three-part carbon form used to notify applicants at the various stages of the selection process.

13. When the GAO personnel office has received a complete application, the first carbon of the Form 501 is used to notify the applicant whether he possesses the minimum qualifications necessary for eligibility to apply for that position and whether his application will be further considered by a screening panel or forwarded to the selecting official.

14. Composed of 4–5 GAO employees, screening panels were utilized to determine those applicants best qualified for all of the positions, with the exception of JOA 79–1050, to which Dr. Singh sought promotion. The panels numerically rated applicants on experience, appraisals, training and development, awards and other supplementary factors. Based upon the numerical ratings, the screening panels certified the best qualified applicants for final consideration by the selecting official. The selecting official conducted interviews and made the final decision respecting the vacancy.

15. Although there was a different panel convened for each job opportunity, Dr. Singh consistently received the lowest rating given any applicant for each of the five positions at issue and which involved screening panels. Consequently, Dr. Singh was not certified among the best qualified applicants for any of the positions he applied for. Issues regarding the rating panels were precluded at the pretrial stage of these proceedings.

16. The second carbon of the Form 501 is used to inform minimally qualified applicants whether or not they have been certified by the screening panel as among the best qualified applicants for the job opportunity. The final carbon gives notice to those in the best qualifying group that they have been selected or not selected, by the

selecting official, to fill the vacancy. Form 501 notices are mailed to the applicants.

17. A GAO Form 503 is an evaluation form meant to assess an applicant's performance in his present position and his potential for successful performance in the target position. The Form 503 is completed by the applicant's immediate supervisor and is signed, with or without comment, by the second-level supervisor. Upon completion, the Form 503 is returned to the applicant who must also sign and date it, indicating that he has reviewed the appraisal.

18. The Form 503 lists the "Critical Job Elements" necessary for successful performance in the target position. The critical job elements listed for the supervisory positions Dr. Singh applied for included, for example, oral and written communication, job planning, data analysis, administrative ability and ability to develop effective working relationships. For each job element, the immediate supervisor is provided a short space in which to give an assessment of the employee's past performance and of his potential for success if selected for the target position.

19. These three GAO Forms are necessary for complete and formal application for open positions within GAO. In fact, the Job Opportunity Announcements, including that for JOA 79–1050, contain a section titled "How to Apply." This section clearly states that GAO employees must submit GAO Forms 501, 503 and 537 in order to be considered for vacant positions and that these forms must be received no later than the closing date indicated.

20. Dr. Singh admits that for JOA 79–1050 he submitted only his most recent Form 503. It was his contention at trial that he believed GAO had a policy of accepting a shortened application consisting only of an employee's Form 503. Dr. Singh contended that the Forms 501 and 537 would not be necessary since he had recently filed a complete, three-part application for JOA 79–1006.

21. The evidence received at trial contradicted Plaintiff's contentions. There was no policy for shortened applications; just as Dr. Singh submitted three forms as application for JOA 79–1006 and four other GS–15 positions, he was required to have a complete three-part application on file in order to be considered for JOA 79–1050.

22. Since Dr. Singh did not submit a formal application for JOA 79–1050, he was never considered for the position. The Court finds that the fact Plaintiff was not considered for this position was wholly the result of his misunderstanding concerning GAO policy and not the result of discrimination or retaliation.

*Performance Appraisals*

23. The first position for which Dr. Singh properly applied was JOA 78–329. With respect to the evaluation Form 503 prepared for this position, Dr. Singh alleges that certain statements included by his immediate supervisor, Chester Daniels, and reviewing supervisor, Donald Day were untrue and discriminatorily motivated. Specifically, Dr. Singh was offended by statements to the effect that he lacked the capability to perform as Supervisory Management Analyst.

24. Throughout the appraisal prepared for Dr. Singh's application for JOA 78–329, Mr. Daniels indicated that he did not believe Dr. Singh possessed sufficient knowledge and experience with GAO policies or the supervisory role to perform well in the target position. For example, with respect to Critical Job Element No. 3, assessing Dr. Singh's ability to "directly supervise three professional staff members," Mr. Daniels stated that while Plaintiff had not had the opportunity to directly supervise three professional staff members, by becoming more familiar with policies and Headquarters to Field relationships Dr. Singh "can become an effective supervisor."

25. Plaintiff testified that he first noticed discriminatory behavior being directed against him on June 14, 1977. He alleges that on that date, while on official assignment in California, he received a harassing telephone call from Donald Day questioning the appropriateness of his trav-

el. He further alleges that upon his return from his official travel, Mr. Day continued to harass him verbally in an attempt to force him out of the Science and Technology Subdivision. Mr. Day acknowledges speaking with Plaintiff and having his concerns addressed; he denies harassing Plaintiff in any way. In this regard, the record contains no evidence beyond Plaintiff's testimony.

26. Sometime following his return from California, Dr. Singh was asked by Mr. Day's secretary to contribute to the Combined Federal Campaign (CFC). Believing the request to be intended by Mr. Day as an insult to his religion, he refused to contribute. In addition, all GAO employees in PSAD/MASAD are asked to contribute money during the Christmas holidays for needy children residing in the neighborhood of the agency. Dr. Singh was treated no differently; he was asked to make a voluntary contribution to the fund for children. Not being of the Christian faith, Plaintiff objected to the request for a charitable contribution during the Christmas season. However, Dr. Singh registered no civil rights complaint.

27. Dr. Singh was asked a second time, by Mr. Daniels, to contribute to the CFC. Dr. Singh mistakenly believed the CFC to be a partisan Christian organization and the request to contribute to constitute religious discrimination. Although he felt that he was being coerced into making a monetary donation to the CFC, he wrote a $5.00 check to the CFC on November 13, 1977. Dr. Singh did not seek EEO aid in combatting what he thought was coercion and religious discrimination.

28. Dr. Singh reviewed and signed the evaluation for his application form JOA 78–329 on January 3, 1978. Despite his belief that the Form 503 contained statements intended to discriminate against him on the impermissible bases of race and religion, he filed no administrative complaint to challenge or correct the alleged inaccuracies and conclusions reached by his supervisors. At trial, Plaintiff presented no evidence which refuted any statement made in his first Form 503.

29. Dr. Singh was minimally qualified to fill JOA 78–329. He was so notified by means of the first carbon of the Form 501, submitted with his application, on or about January 16, 1978. While records from the GAO personnel office indicate that Dr. Singh was properly notified with respect to each of his five applications, he maintains that the first notice for JOA 78–329 was the only Form 501 notice he ever received.

30. The second position Dr. Singh applied for was in the Logistics and Communications Division (LCD), JOA 79–1006. At trial, Plaintiff contended that before applying for JOA 79–1006, he discussed his desire for promotion with Mr. Jerome Stolarow. Dr. Singh testified that Mr. Stolarow informed him that he would never be promoted because he joined GAO as the result of a discrimination complaint. Plaintiff did not seek redress in response to statements he believed to confirm that retaliatory action was being taken against him.

31. Mr. Stolarow was unavailable for the trial. However, his sworn affidavit gives evidence that Dr. Singh misunderstood statements made to him regarding his chances for promotion. Mr. Stolarow denies ever having told Dr. Singh that the manner in which he joined the agency hindered his advancement. Instead, Mr. Stolarow states that he told Dr. Singh that his training was not what the agency needed for managerial personnel. Mr. Stolarow believed Dr. Singh to be unqualified for the management of GAO audits and reports.

32. Although Dr. Singh did not take administrative action with respect to the statements made by Mr. Stolarow, he did complain to Mr. Stolarow about allegedly retaliatory statements made by Dr. Barmby. Following his conversation with Mr. Stolarow, Plaintiff wrote a letter, dated September 4, 1979, to Mr. Stolarow to inform him that Dr. Barmby had discouraged him from applying for JOA 79–1006, the same position to which Mr. Stolarow is alleged to have told Plaintiff he would not be promoted because of his prior discrimi-

nation complaint. No action was taken regarding his letter and Plaintiff did not pursue the matter.

33. The records from the GAO personnel office show that on August 22, 1979 Plaintiff was notified that he was among the applicants qualified to fill the vacancy. He was notified that he had not been certified by the screening panel as one of the six (6) best qualified applicants on September 11, 1979. The final selection was made September 17, 1979.

34. Soon thereafter, Dr. Singh again sought promotion with his partial application for JOA 79–1050. The partial application was insufficient for consideration Dr. Singh, therefore, did not compete for selection to JOA 79–1050.

35. Dr. Singh applied for promotion to JOA 80–1082, a position as assistant regional manager in the Seattle, Washington field office of the agency. He was notified that he was minimally qualified on January 14, 1980. Notice that he was not among the four (4) best qualified applicants was sent to him on January 21, 1980. The vacancy was filled on February 5, 1980.

36. The Form 503 filed in connection with Plaintiff's application for JOA 80–1082 was prepared by Dr. John Barmby and signed by Mr. Jerome Stolarow on December 28, 1979. Plaintiff's signature indicates that he reviewed the application in January 1980.

37. Dr. Barmby was asked to evaluate Plaintiff's oral communication skills. In response, he said of Plaintiff's potential for oral communication in the target position: "His mien is basically serious. He does not have the outgoing personality typical of assistant regional managers."

38. Dr. Singh construed the statement as discriminatory toward his religion. He argues that his beliefs require him to maintain a serious demeanor and that to make a statement about his manner constitutes religious discrimination. The Court finds that the statement concerning Dr. Singh's demeanor was not motivated by discrimination but was an observation made by Plain-

tiff's supervisor of Plaintiff's ability to communicate effectively with others.

39. Two months following his application and non-selection for JOA 80–1082 Dr. Singh applied to fill a third vacancy, JOA 80–1160 in the Fossil Energy Supply and Regulation Group (EMD). The personnel office file with respect to this job opportunity indicates that notice was sent to Plaintiff that he was minimally qualified for the position on March 17, 1980. Notice that he had not been certified by the rating panel as among the seven (7) best qualified applicants was sent March 22, 1980. The final selection for JOA 80–1160 was made April 11, 1980.

40. Dr. Barmby again completed an evaluation for Plaintiff's application. The Form 503 for JOA 80–1160 was completed by Dr. Barmby and signed by himself and Mr. Walton Sheley on February 28, 1980. Dr. Barmby indicated that he believed Dr. Singh to have demonstrated the potential to perform the assignment in EMD. Mr. Sheley concurred in this evaluation and added that Dr. Singh could perform the target job in a "superior" manner. No signature appears indicating Plaintiff's review.

41. For the critical job element "Establishing and maintaining effective working relationships and EEO" Dr. Barmby noted of Plaintiff, "[b]eing from an Asian country, he is well aware of minority concerns." Plaintiff complains that this statement unfairly and unnecessarily revealed his national origin to the rating panel. Given the context of the comment, the Court finds no discriminatory intent regarding national origin.

42. The same statement concerning Plaintiff's background is contained in the Form 503 prepared in connection with his application for JOA 80–1190. This particular vacancy occurred in the International Division (ID). Dr. Barmby also stated in his final comments on this Form 503 that "Dr. Singh has exceptional technical qualifications." Dr. Barmby also stated that Dr. Singh's "Asian background and experience as well as his wide reading in interna-

tional journals should be of great value to ID."

43. At trial, Dr. Barmby testified that he made the above statements with the hope that they would aid Dr. Singh in his promotion attempt. He believed that Dr. Singh's international experience would be considered favorably since the job opportunity was in the International Division. Considering the context, there was no intent to discriminate on the basis of national origin in Dr. Barmby's comments.

44. The Form 503 prepared form JOA 80–1190 was completed by Dr. Barmby March 24, 1980. Mr. Stolarow also signed this evaluation with the comment that "Dr. Singh has been a valuable member of our Systems Analysis Staff." He further stated that "[b]ased on the evaluations herein, and my personal observations, Dr. Singh would perform in the target assignment in a proficient manner."

45. Dr. Singh believed this comment to be inaccurate since it is his opinion that he should have received a more laudatory word should have been used by his supervisors. Further, Dr. Singh testified that applicants who were not characterized in the words "outstanding" or "excellent" will not receive numerical ratings from the screening panels which would allow consideration for promotion more than "proficient." Dr. Barmby also testified that an "excellent" rating would better an employee's chance for promotion. Dr. Singh did not persuade the Court that Mr. Stolarow's comment was disingenuous.

46. Further, Plaintiff made no attempt to seek redress or to prevent what he believed to be a discriminatory evaluation from being considered in his application for JOA 80–1190. There is no signature on the Form 503 to indicate when he reviewed the evaluation.

*Retaliation*

47. One of Plaintiff's primary contentions in this action is that the fact that he joined GAO through the settlement of an administrative EEO complaint was made general knowledge and used against him whenever he applied for promotion to the GS–15 level. Dr. Singh contends that this was done in retaliation for his exercise of rights under Title VII.

48. Four of the five evaluations which were prepared for Dr. Singh's applications for promotion were completed by Dr. Barmby. Dr. Barmby testified that he learned of the manner in which Dr. Singh joined GAO shortly after Plaintiff joined his staff. He was casually told of the circumstances of Dr. Singh's employment with GAO in a conversation with Mr. Gutmann.

49. Mr. Donald Day was unaware of Dr. Singh's 1976 discrimination complaint until the commencement of this action resulted in the taking of his deposition in May 1983. Mr. Day was informed of the circumstance under which Plaintiff joined GAO on the day before his deposition. Mr. Walton Sheley also remained unaware of the manner in which Plaintiff joined GAO until after he had filed the discrimination complaint which is the subject of this action.

50. There was no evidence presented to show that Dr. Barmby ever discussed his knowledge of Plaintiff's 1976 discrimination complaint with anyone in GAO. Dr. Barmby testified that he believed that fact to be irrelevant to Plaintiff's promotability and that he did not consider the manner in which Dr. Singh joined GAO when he prepared Plaintiff's evaluations.

51. With JOA 80–1082 as the only exception, Dr. Barmby's overall assessment of Plaintiff's potential was consistently positive and concluded that Dr. Singh possessed the skills necessary for the position. In each evaluation, Dr. Barmby rated Plaintiff's technical skills as excellent; however, he maintained reservations regarding Dr. Singh's ability to work effectively with others.

52. To support his statements to the effect that Dr. Singh had trouble relating to the generalists within GAO, Dr. Barmby cited that he remembered Plaintiff having disagreements with at least one supervisory evaluator, Mr. Harold Fulk. Dr.

Barmby spoke with Dr. Singh about the need to cooperate with non-technical personnel. The discussion became somewhat heated and Dr. Barmby raised his voice to Plaintiff.

53. Mr. Fulk testified that he did have disagreements with Dr. Singh. He stated that those disagreements were of a type that normally arise when working on GAO audits with technical personnel. He stated that it is not unusual for personnel to disagree when working together and that cooperation with the supervisor is necessary because his decision is the final one.

54. Beyond the fact that Dr. Barmby knew of the circumstances of Dr. Singh's employment, Plaintiff alleges that his immediate supervisor told him that he would not be promoted and tried to force him to transfer. Dr. Barmby refutes this. He testified that he told all of his subordinates that, being technical specialists, their opportunities for advancement were more limited than persons in the general areas of GAO. He said he told the specialists that one strategy for improving their chances for promotion would be to make a lateral transfer into one of the general areas and seek promotion from there.

55. The evidence does not establish that Dr. Barmby acted upon retaliatory motives when he advised Plaintiff that his promotion opportunities from PSAD/MASAD were limited or in the preparation of Plaintiff's evaluations. Nor does the evidence establish that Mr. Daniels, Mr. Day or Mr. Sheley even knew of Plaintiff's prior discrimination complaint before their involvement with his evaluations.

56. The evidence adduced at trial showed that the circumstances surrounding Dr. Singh's employment with GAO became general knowledge only after his second discrimination complaint was filed and after Dr. Singh had unsuccessfully tried for five (5) promotions. Although Dr. Singh believed otherwise, the manner in which he joined GAO did not become general knowledge until it was made the subject of his second discrimination complaint against the agency.

*Awards, Commendations and Travel Assignments*

57. In addition to his claims of retaliation, racial and religious discrimination, Dr. Singh alleges unfair treatment with respect to the award of commendations and honors. It is Plaintiff's belief that he should have received recognition and cash awards for certain publications.

58. Plaintiff did not establish at trial that the agency had a policy of awarding commendations or cash bonuses for publications in national or international journals. Nor did Plaintiff demonstrate that other GAO employees have received such recognition for publishing in similar circumstances.

59. In contradiction to Plaintiff's contention that the agency was remiss in not commending him for publishing articles outside the agency, unrefuted evidence adduced at trial demonstrated that it is the responsibility of the employee to alert the agency of outside accomplishments by submitting such information for publication in the GAO newsletter, *GAO Management News.*

60. Two letters of appreciation are also made the subject of this discrimination suit. Plaintiff alleges that a letter written to the Associate Director of PSAD/MASAD, Mr. Frank B. Chemery, should have been placed in his personnel file. Dated June 9, 1980 and written by Mr. I.S. Jaswal, a Canadian scientist, the letter expresses appreciation to several GAO employees, among them Dr. Singh, for his efforts in escorting Mr. Jaswal while he was at GAO and for discussing technical matters with him.

61. The second letter of appreciation was written to the Comptroller General, Elmer B. Staats. From the Hon. Toby Moffett, Chairman of the House of Representatives Subcommittee on Environment, Energy and Natural Resources, the second letter extended the Subcommittee's appreciation for a GAO "talking paper" detailing management and technical deficiencies of a planned synthetic fuel project. Dr. Singh

and Mr. Leo Weintraub were responsible for the preparation of the "talking paper."

62. Plaintiff did not demonstrate that the agency had a policy or duty to place such letters of appreciation in employee personnel files. Nor did Dr. Singh persuade the Court that he should have received agency awards, commendations or cash bonuses for the appreciation expressed in these letters.

63. The record produced in this case does not justify a finding that Plaintiff's five applications for promotion were affected, motivated or the result of retaliation or discrimination of any kind.

64. Dr. Singh makes allegations of discrimination in travel assignments as well. He claims that he was unfairly denied the opportunity to attend training conferences or conferences related to ongoing projects even when Dr. Barmby recommended that he do so. However, Plaintiff failed to demonstrate that others in similar circumstances were allowed to take travel assignments.

*Administrative Complaint*

65. In spite of his belief that retaliatory and discriminatory actions had been taken against him with respect to awards and commendations, evaluations and requests for charitable donations, Dr. Singh did not take steps to obtain administrative relief until August 15, 1980. On this date, Dr. Singh contacted an EEO complaints counselor and thereby triggered the informal counseling process, a prerequisite to filing a formal complaint for discrimination.

66. There was a certain amount of agency confusion regarding Dr. Singh's administrative complaint, beginning with a change in complaints counselors during the informal stage. There were three counselors placed on Dr. Singh's case, concluding with the assignment of Mr. Gerald Tebeau on September 24, 1980.

67. Mr. Tebeau began counseling Dr. Singh on September 25, 1980. Since the matter had not been informally resolved to Plaintiff's satisfaction within 21 days, under the governing regulation, 29 C.F.R. § 1613.213(a), Dr. Singh should have received written notice of his right to file a formal complaint of discrimination on October 15, 1980. Mr. Tebeau forgot to so notify Dr. Singh. The matter was not brought to the attention of Mr. Silva, Director of the Civil Rights Office until November 1980 when Dr. Singh contacted the Comptroller General's Office inquiring about the status of the complaint. Steps were taken to clear up the situation and Mr. Tebeau issued the required notice on November 12, 1980.

68. Nonetheless, the confusion surrounding Dr. Singh's informal complaint persisted into December and through January 1981. Mr. Tebeau conducted his final interview with Dr. Singh on February 18, 1981 and at that time presented him with written notice of his right to file a formal complaint of discrimination with an appropriate agency official.

69. Dr. Singh did not file a formal complaint but insisted that he had done so when he presented his written grievances to the first EEO complaints counselor. Plaintiff eventually took his dissatisfaction with the complaints process to the GAO Personnel Appeals Board. In an effort to conciliate the matter, the Personnel Appeals Board requested that, although considerably delayed, the Civil Rights Office accept Dr. Singh's formal complaint. Mr. Silva agreed to do so; Dr. Singh's formal complaint was filed on or about June 1, 1981.

70. While there was indeed confusion attending Dr. Singh's informal complaint, it also appears that Plaintiff refused to accept the agency's determination that he had not filed a formal complaint and would be required to so before his administrative action could be taken further.

71. It further appears to the Court that the record does not justify a finding that in this confusion the Civil Rights Office or Mr. Silva obstructed Dr. Singh's efforts to seek administrative relief. On the contrary, every attempt was made to accommodate the filing of his formal administrative complaint.

## CONCLUSIONS OF LAW

■ 1. The Court has jurisdiction in this action under Title VII of the Civil Rights Act of 1964, as amended, brought by an employee of a federal government agency, covered by 42 U.S.C. § 2000e–16(a), to redress claimed harassment and discrimination in the failure to promote based upon race, religion, national origin and retaliation.

■ 2. The Court first concludes that only five promotions are at issue. Since Plaintiff did not properly apply for JOA 79–1050, he was not considered for the position. Therefore, no unlawful action could have been taken against him in this instance.

3. It is established that the basic formula by which an action for discriminatory treatment is to be determined is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *McDonnell Douglas* formula is adjusted for the particular circumstances accompanying discrimination in promotions in *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981).

■ 4. However, before making an inquiry into the merits of Plaintiff's claims, the question of his timeliness in filing his administrative complaint must be addressed. Discrimination claims which are not filed within the statutory limitations are "time-barred." *Milton v. Weinberger*, 645 F.2d 1070, 1074 (D.C.Cir.1981); *Shehadeh v. C & P Telephone Co.*, 595 F.2d 711, 717–718 (D.C.Cir.1978). The Supreme Court has gone so far as to remark that

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the statute or a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

*United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

■ 5. The governing regulation, 29 C.F.R. § 1613.214(a) (1980), provides that

The agency may accept the complaint for processing in accordance with this subpart only if—(i) the complainant brought to the attention of the Equal Employment Opportunity Counselor the matter causing him to believe he had been discriminated against within 30 calendar days of the date of that matter or if a personnel action, within 30 calendar days of its effective date.

Dr. Singh did not bring his complaint to the attention of an EEO counselor until August 15, 1980, although he knew he had not been selected for any of the five promotions more than 30 calendar days in advance of this date and believed himself to be the victim of other retaliatory acts throughout his six year employment with the agency.

6. While Plaintiff argues that the agency waived the relevant time limits, it is Defendant's position that Plaintiff's tardiness in initiating his discrimination complaint is fatal to this action. Moreover, the agency could not "waive" or otherwise affect what is ultimately this Court's determination. The record substantiates the agency's contention that Plaintiff was sent notice of his non-selection for JOA 78–329 more than 2½ years before he brought his discrimination complaint to an agency EEO counselor. Almost one full year had passed after the final selection for JOA 79–1006, more than 200 days had passed for JOA 80–1082, 150 days from the selection for JOA 80–1160, and for the last position, JOA 80–1190, more than 100 days elapsed before Plaintiff alerted an EEO counselor of his suspicions. Dr. Singh presented no contradicting evidence.

7. The fact that Plaintiff delayed taking action means that, when timely filed in this Court, the discrimination action was already legally "stale." The time period requirements were placed in Title VII to prevent the pressing of "stale" claims. *Zipes v. Trans World Airlines, Inc.*, 455 U.S.

385, at 394, 102 S.Ct. 1127, 1133, 71 L.Ed.2d 234 (1982). Plaintiff has not alleged that he was prevented in any way from bringing his grievances to a civil rights counselor before August 15, 1980. The confusion which surrounded his filing a formal complaint of discrimination has no bearing on the timeliness of his initial informal complaint; indeed, all confusion occurred subsequent to Plaintiff's tardy filing.

■ 8. The Court concludes that while filing a timely charge of discrimination is subject to waiver, estoppel, and equitable tolling, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), Plaintiff has proffered no reason for the application of the doctrine to this action. Without such an argument, and the facts demonstrating that Plaintiff was unduly late, this action is "time-barred." For this reason, Plaintiff may not receive relief from this Court.

■ 9. Under the test set forth in *McDonnell Douglas*, a plaintiff must establish a *prima facie* case of discrimination by demonstrating that (1) he is a member of a protected class; (2) there is a position for which he applied; (3) he was qualified for the position; and (4) the position was not filled by the employer continued to look for someone to fill it. 411 U.S. at 802, 93 S.Ct. at 1824.

■ 10. While the ultimate burden of proof remains at all times with the plaintiff, a *prima facie* case of discrimination creates a rebuttable presumption against the defendant. Once a *prima facie* case has been made out by the plaintiff, the burden of production shifts to the employer-defendant to articulate a legitimate, non-discriminatory reason for the employment decision complained of. At this point, in order to carry his burden, the plaintiff must demonstrate to the Court's satisfaction that the reasons postulated by the defendant are mere pretext for discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If the plaintiff cannot counter the articulated reasons, then judgment must be entered for the defendant.

■ 11. Moreover, were the Court to conclude that the time limitations should not be considered in Dr. Singh's case, he would remain without relief. Plaintiff has utterly failed to prove his case on the merits. Although the burden of establishing a *prima facie* case of discrimination is not "onerous," *Texas Dept. of Community Affairs, v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093, Dr. Singh was unable to reach even this threshold requirement for Title VII relief.

12. Plaintiff's allegations against the officials at GAO are woefully inadequate to support a *prima facie* inference of unlawful discriminatory treatment. The contention that a religious slur was intended by including him in a request for a donation to the Combined Federal Campaign cannot be considered seriously. The contentions that a reference to his Asian background made in the context of measuring his potential for understanding EEO concerns as a supervisor and noting that his international experience would be useful in the International Division, are likewise, untenable. There is absolutely no merit to Plaintiff's allegations of religious discrimination or discrimination on the basis of national origin.

13. Nor does the evidence support a conclusion that any statements made in Dr. Singh's evaluations were retaliatory efforts intended to prevent his advancement within the agency. In the two instances he was not given an overall favorable rating, JOA 78–329 and JOA 80–1082, his supervisors' clearly stated concern was with the appropriateness of his recognized technical skills for the target positions; there was no discriminatory animus demonstrated in either instance. Therefore, the Court concludes that Plaintiff did not demonstrate circumstances giving rise to an inference of retaliation.

14. If, for the moment, the Court were to presume that Plaintiff had established a *prima facie* inference of discriminatory treatment based upon the evidence proffered at trial, nonetheless the Court would necessarily conclude that any presumption had been successfully negated by the agency. The reasons offered at trial for the various statements made in Plaintiff's appraisals were legitimate, neutral and non-discriminatory. Plaintiff failed to make even a slight showing that the reasons articulated by the agency officials were pretext for discrimination retaliation in violation of Title VII.

15. The nature of Dr. Singh's allegations of discriminatory treatment requires the Court to decide "which party's explanation of the employer's motivation it believes." *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Upon considering all of the evidence presented at trial, the Court concludes that there is no justification for finding in favor of Plaintiff. Plaintiff sought to prove a case of discrimination by way of circumstantial evidence of the flimsiest kind. The meager evidence which was presented was successfully refuted by Defendant.

16. In summary, the Court concludes that Plaintiff was unjustifiably late in bringing his claims of discrimination and retaliation. Moreover, on the merits he failed to carry his burden of persuasion. In considering all of the evidence properly presented and giving that evidence the weight and credence it deserves, *U.S. Postal Service Board of Governors v. Aikens*, 103 S.Ct. at 1482 n. 3, this Court concludes that none of the complained of actions were unlawful. On the record in this case, Plaintiff could not prove discrimination by a "preponderance of the evidence."

17. Accordingly, judgment shall be entered in favor of the Defendant, Charles A. Bowsher, Comptroller General of the United States General Accounting Office and against Plaintiff, Dr. Manohar Singh on all claims.