**Paul R. ROWE, Plaintiff,**

v.

**James KIDD and Congressional Quarterly, Inc., Defendants.**

**Civ. A. No. 88–3277.**

United States District Court,
District of Columbia.

Feb. 16, 1990.

---

1. Indeed, the document as a whole, including its terms and conditions, is largely illegible and blurred.

Catherine M. Thomas, Washington, D.C., for plaintiff.

Robert J. Smith, Michael A. Putetti, James V. Blair, Morgan, Lewis & Bockius, Washington, D.C., for defendants.

## ORDER

REVERCOMB, District Judge.

On November 10, 1988, Plaintiff Paul E. Rowe filed the complaint in this action alleging, *inter alia*, that Defendants, Congressional Quarterly, Inc. and James Kidd, violated the Civil Rights Act of 1866, 42 U.S.C. § 1981, by disciplining him and terminating his employment. After Plaintiff obtained leave from this Court to amend his complaint several times, and after Defendants moved to dismiss, this Court issued a September 22, 1989 Order which set forth the scope of the complaint. As a result, the Third Amended Complaint now contains five causes of action: disparate treatment and impact under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., intentional infliction of emotional distress, breach of implied-in-fact contract, and promissory estoppel. This matter is before the Court pursuant to Defendants' motion for summary judgment.

## I. DISPARATE TREATMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judg-

ment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

The substantive law defines which facts are material. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. The essential elements of a Title VII case are set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). To state a prima facie case the record facts must show that: (1) Plaintiff is a member of a racial minority; (2) he was qualified for continued employment and was satisfying the normal requirements of his job; (3) he was terminated; and (4) either he was replaced by a nonminority employee, or nonminority employees with comparable qualifications and work records were not terminated. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Hughes v. Chesapeake and Potomac Tel. Co.,* 583 F.Supp. 66, 69 (D.D.C.1983); *Keller v. Association of Am. Medical Colleges,* 644 F.Supp. 459, 462 (D.D.C.1985), *aff'd,* 802 F.2d 1483 (D.D.C.1986); *Tickles v. Hodel,* 40 EPD (CCH) ¶ 36,262, 1986 WL 11130 (D.D.C.1986).

■ The burden of proof and of production is well-established. *See Burdine,* 450 U.S. at 252–56, 101 S.Ct. at 1093–95; *McDonnell Douglas,* 411 U.S. at 792, 93 S.Ct. at 1817. Plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of employment discrimination. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If Plaintiff can establish a prima facie case, the burden shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for its actions; this burden is merely one of production, not of persuasion. *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094; *Cuddy v. Carmen,* 762 F.2d 119, 123 (D.C.Cir.1984). Once the Defendant articulates a nondiscriminatory reason for its actions, the Defendant is entitled to judgment unless Plaintiff can prove by a preponderance of the evidence that the proffered reason is simply a "pretext" or coverup for racial discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff must prove that the Defendant's proffered explanation is "unworthy of credence." *Id.* Plaintiff's burden to establish a pretext "now merges with the ultimate burden of persuading the court that he has been the victim of intentional discrimination." *Id.* Thus, the burden of persuasion does not shift at any point to Defendant, but remains throughout upon Plaintiff who has the ultimate burden of proving that the Defendant discriminated against him. *McKenna v. Weinberger,* 729 F.2d 783 (D.C.Cir.1984).

■ Based on the undisputed facts in the record of this case Plaintiff is unable to state a prima facie case of disparate treatment.[1] It is not disputed that Plaintiff is a member of a minority group and that he was terminated, thus establishing two elements of a prima facie case. However, as to the remaining elements which are essential to Plaintiff's case and on which Plain-

---

**1.** Plaintiff has not submitted a statement of material facts as to which he contends there exists a genuine issue necessary to be litigated. Accordingly, pursuant to Rule 108(h) of the Local Rules, this Court deems as admitted the facts set forth in Defendants' Statement of Undisputed Material Facts (hereinafter "UNDISPUTED FACTS"). To the extent that Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment asserts facts contrary to those in Defendants' Statement of Undisputed Material Facts, Plaintiff has not included any "references to the parts of the record relied on to support the statement." *See* Local Rule 108(h). Moreover, the record demonstrates that there is no support for several of the statements made in Plaintiff's Memorandum.

tiff would bear the burden of proof at trial, Plaintiff has failed to make a showing to establish their existence and summary judgment is accordingly mandated in favor of Defendants. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Plaintiff concedes that he did not meet the performance standards established by his employer. *See* UNDISPUTED FACTS 30. However, Plaintiff claims that nonminority employees with comparable qualifications and work records were treated differently than he was. The undisputed facts of record do not support his claim.

Plaintiff was employed as one of four sales representatives by Defendant CQ in its Washington Alert Service Division from March 3, 1986 through August 31, 1987. On or about May 4, 1987, Defendant Kidd was hired as WAS's sales manager, responsible for supervising and directing the activities of the sales representatives. During May 1987, Defendant Kidd began to develop specific strategies to improve the WAS sales performance. Defendant Kidd determined that one means by which to improve sales performance would be to present the WAS product more frequently to prospective customers. Accordingly, he placed importance on pre-sale activity, specifically, the number of appointments a sales representative scheduled and the number of proposals that a sales representative submitted. UNDISPUTED FACTS 13.[2]

Defendant Kidd established monthly "foundational," or minimum, performance standards for (1) sales appointments, (2) proposals and (3) new unit sales. The monthly standards required 32 appointments, 12 proposals, and 4 new unit sales. Plaintiff and the other sales representatives reviewed the standards with Defendant Kidd and Plaintiff concurred that the standards were reasonable and achievable. UNDISPUTED FACTS 17. The standards became effective as to Plaintiff and two

other employees, Waldo Tibbetts and Dennis Cronley, on June 1, 1987. A fourth sales representative, Kharry Wolinski, was not placed on the standards until July. UNDISPUTED FACTS 18.

In the month of June, Plaintiff failed to meet each of these three standards by a large margin. He was the only one who failed to meet all three of the standards. Plaintiff achieved 37.5% of his appointments (12 of 32) and 25% of his proposals (3 of 12). In contrast, Tibbetts achieved 112.5% of his appointments (36 of 32) and 91.6% of his proposals (11 of 12). Cronley achieved 62.5% of his appointments (20 of 32) and 100% of his proposals. UNDISPUTED FACTS 20.

As a result of Plaintiff's poor performance, Defendant Kidd gave Plaintiff a memorandum warning him that his performance was well below standard. UNDISPUTED FACTS 21. Defendant also gave Cronley a memorandum informing him that his appointments were below standard. UNDISPUTED FACTS 24.

During the first two weeks of July 1987, Plaintiff had only three appointments. UNDISPUTED FACTS 23. Defendant Kidd met with Plaintiff on or about July 15 to discuss Plaintiff's performance level, and followed that meeting with a memorandum to Plaintiff expressing his concern. UNDISPUTED FACTS 23. At the end of July, Plaintiff was once again far below each of the three performance standards and was the only sales representative who failed to meet those standards. Plaintiff achieved 59% of his appointments (19 of 32) and 50% of his proposals (6 of 12). In contrast, Cronley had 134% of his appointments (43 of 32) and 150% of his proposals (18 of 12). Tibbetts had 121% of his appointments (39 of 32) and 150% of his proposals (18 of 12). Wolinski, even though she was on vacation for part of July, was able to achieve 84% of her appointments (27 of 32) and 150% of her proposals (18 of 12).

---

**2.** It is not necessary for this Court to pass on the wisdom of those standards. "[I]t is not the business of a court hearing a Title VII case to 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"

*McCormack v. District of Columbia,* 554 F.Supp. 640, 646 (D.D.C.1982) (quoting *Milton v. Weinberger,* 696 F.2d 94, 100 (D.C.Cir.1982)); *see also Carolina v. Kaiser Foundation Health Plan,* No. 89–0850, 1990 WL 20045 (D.D.C. Feb. 8, 1990).

UNDISPUTED FACTS 19. On July 31, Defendant Kidd gave Plaintiff a memorandum informing him of his poor performance and placing him on a 30–day probation because of his failure to meet his performance standards in July. UNDISPUTED FACTS 26.

In August, Plaintiff once again was the only sales representative who failed to meet each of the three performance standards. Plaintiff achieved only 60% of his appointments (19 of 32) and 91% of his proposals (11 of 12). In contrast, Cronley achieved 75% of his appointments (24 of 32) and 125% of his proposals (15 of 12). Tibbetts achieved 137.5% of his appointments (44 of 32) and 108% of his proposals (13 of 12). Wolinski achieved 108% of her appointments (35 of 32) and 166% of her proposals (20 of 12). UNDISPUTED FACTS 19.

On August 31, 1987, Plaintiff was terminated for failing to meet the WAS sales performance standards. During the three months since the performance standards had been in effect Plaintiff was the only sales representative who did not meet *any* of the three performance standards in *any* of the three months. Moreover, even when another sales representative failed to meet a given standard in a given month, his or her performance was superior to Plaintiff's in virtually every instance.

Notwithstanding the undisputed deficiencies discussed above, Plaintiff claims that Defendants were required to treat him similarly to the other sales representatives on the grounds that his new unit sales were comparable [3] and because the other employees failed to meet all of the employer's standards.

However, simply because the sales representatives had comparable records with respect to new unit sales, the Defendants were entitled as a matter of law to consider other factors that they believed were important in evaluating job performance, namely, sales appointments and proposals. In *Carolina v. Kaiser Foundation Health Plan,* No. 89–0850, 1990 WL 20045 (D.D.C. Feb. 8, 1990), the plaintiff was a black licensed practical nurse who was terminated because she was frequently tardy to and absent from work, was frequently out of her assigned clinical area when on duty, and failed to follow established procedures in meeting patients' needs, including providing injections and recording prescriptions. Although the Plaintiff alleged that a nonminority nurse was frequently tardy to work and yet was never reprimanded or terminated, the court ruled as a matter of law that the employer was not required to treat the nonminority employee similarly because the plaintiff was terminated for many reasons in addition to her tardiness:

> Plaintiff cites to no record facts to support her claim that the white employee who was more tardy than Plaintiff also had a lengthy history of other employment-related problems similar to Plaintiff's. An employer is not required to discharge all employees who fall below a standard that the employer considers satisfactory. Rather, the employer may discharge an employee whose performance is far below that of her coworkers regardless of the employee's race, even if that employee alone is a member of a protected class. The employer may also consider other aggravating and mitigating factors among employees when taking action or inaction in assessing job performance.

Moreover, simply because the other sales representatives did not reach 100% of their quotas every month, the Defendants were entitled as a matter of law to treat them differently from the Plaintiff where the Plaintiff's performance was undisput-

---

**3.** None of the sales representatives, with the exception of Cronley in July, met the standard for new units:

|  | PLAINTIFF | CRONLEY | TIBBETTS | WOLINSKI |
|---|---|---|---|---|
| June | 0 | 0 | 0 | 3 |
| July | 2 | 5 | 2 | 1 |
| August | 2 | 1 | 1 | 1 |
| Total | 4 | 6 | 3 | 5 |

edly inferior. In *Hughes v. Chesapeake &
Potomac Tel. Co.*, 583 F.Supp. 66 (D.D.C.
1983), the employer maintained an attend-
ance policy under which an employee was
given an "unsatisfactory" attendance rat-
ing if the employee was absent for more
than 12 days during a 12–month period and
placed on a "High Absence List." *Id.* at
68. Although other employees were on the
"High Absence List" as well, the plaintiff
ranked first on that list, with 70 absences.
*Id.* at 70. The employer issued the plaintiff
a warning letter advising her that if her
attendance did not improve she would be
suspended or dismissed. After several
more absences, she was asked to resign
because of her unsatisfactory attendance.
*Id.* at 68.

The court in *Hughes* ruled that the plain-
tiff had failed to establish that she was
satisfying the normal requirements of her
job: "Some showing of satisfactory per-
formance is necessary to raise an inference
of discrimination. * * * The records indi-
cate that the plaintiff's attendance was 'un-
satisfactory.'" *Id.* Moreover, the court
ruled that the plaintiff had failed to iden-
tify any employee, regardless of race, who
was similarly situated and had not been
terminated. The court defined "similarly
situated" as "a short-term employee who
had accumulated a substantial number of
absences in one year." *Id.* The court ac-
knowledged that there were other employ-
ees who had accumulated a large number
of absences in a 12–month period who had
not been asked to resign, but ruled that the
employer had the right to take previous
satisfactory attendance records into ac-
count in rating its employees. *See also
Carolina,* ("An employer is permitted to
distinguish between those employees who
are marginally below performance stan-
dards and those, like Plaintiff, who are

substantially below those standards.");
*Keller v. Association of American Medi-
cal Colleges,* 644 F.Supp. 459 (D.D.C.1985),
*aff'd,* 802 F.2d 1483 (D.C.Cir.1986); *Brown
v. United States Steel Corp.,* 698 F.Supp.
1375 (N.D.Ill.1988).

■ Although the Plaintiff does not dis-
pute any of the above-recited facts upon
which this Court bases its ruling, Plaintiff
relies upon the Determination rendered by
the District of Columbia Office of Human
Rights, *In re Paul E. Rowe v. Congres-
sional Quarterly,* Docket No. 87–489–P(C),
which found that Plaintiff had established
a prima facie case of discrimination and
found probable cause to believe that Defen-
dant CQ violated the District of Columbia
Human Rights Act, D.C.Code § 1–2501 et
seq. The Plaintiff argues:

> OHR based its Determination that proba-
> ble cause exists to believe that plaintiff
> was discriminated against, upon its inves-
> tigation of the facts. Clearly, if an agen-
> cy whose business it is to investigate
> charges of discrimination, has found a
> basis for such charges, at a minimum, a
> genuine issue as to whether plaintiff was
> the victim of disparate treatment exists
> in this case, which is based upon the
> identical facts.

There are two fundamental problems
with the Plaintiff's argument. First, as a
matter of record, the OHR did *not* base its
determination "upon the identical facts"
which are before this Court. The undisput-
ed facts before this Court flatly contradict
at least four of OHR's findings upon which
the Determination was based.[4]

The second problem with the Plaintiff's
argument is that an OHR Determination is
not entitled to preclusive effect because it
is the result of a nonadversarial, nonadjudi-

---

**4.** For example, the Determination finds that
"[a]t the end of August 1987, [Plaintiff] had
attended a total of fifty (50) appointments while
Mr. Tibbetts had attended only forty-four (44)
appointments." However, the undisputed facts
of the record before this Court show that at the
end of August 1987, Tibbetts had attended a
total of 119 appointments. UNDISPUTED
FACTS 19. Another instance of factual error in

the Determination findings is that "[o]nly
[Plaintiff] was given a written warning." Again,
this finding is inconsistent with the undisputed
facts before this Court which show that Cronley
was also issued a written warning on the same
date as Plaintiff. UNDISPUTED FACTS 24.

cative, investigatory procedure.[5] *See Alder v. Columbia Historical Society*, 690 F.Supp. 9, 13 (D.D.C.1988) (unlike adjudicative proceedings before the Commission on Human Rights, OHR proceedings "provide inadequate opportunity to litigate the factual issues that are at the core of plaintiff's claim."). Similarly, the Supreme Court has held that a finding concerning probable cause by the Equal Employment Opportunity Commission is not binding on a court in a subsequent lawsuit. *See McDonnell Douglas*, 411 U.S. at 799, 93 S.Ct. at 1822 ("in view of the large volume of complaints before the Commission and the nonadversary character of many of its proceedings, 'court actions under Title VII are *de novo* proceedings' ").

## II. DISPARATE IMPACT

■ Plaintiff also alleges a claim of "disparate impact" under Title VII. However, Plaintiff's disparate impact claim is no more than a recharacterization of his disparate treatment claim, i.e., *"discriminatory execution* of [Congressional Quarterly's] rules and regulations—particularly its disciplinary and discharge policies," Third Amended Complaint ¶ 23, which, according to Plaintiff, constitutes *"intentional,* invidious discrimination." *Id.* ¶ 24.

The Supreme Court has described the differences between disparate treatment and impact claims:

"[D]isparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment....

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity....

Proof of discriminatory motive, we have held, is not required under a disparate-impact theory.

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1976) (citations omitted).

Plaintiff fails to identify a specific neutral practice or policy that has a disproportionate impact on blacks, *see Wards Cove Packing Co., Inc. v. Atonio*, — U.S. —, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), and fails to allege that the Defendants' disciplinary and discharge policies are "applied equally" to all employees or that they "necessarily operate[ ]" to discriminate against black employees. *See Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). Rather, Plaintiff claims that these rules were *discriminatorily* applied against him, and not similarly applied against white employees; in other words, he is alleging that he was treated differently than white employees, the very essence of a disparate treatment claim.

## III. PENDENT STATE LAW CLAIMS

■ The Plaintiff in his Third Amended Complaint has asserted claims of intentional infliction of emotional distress, breach of an implied-in-fact employment agreement and promissory estoppel.

As an initial matter, this Court expresses doubt whether it would have retained pendent jurisdiction over Plaintiff's state law claims even if his Title VII claims were to go forward. *See Bouchet v. National Urban League, Inc.*, 730 F.2d 799, 805–06 (D.C.Cir.1984). However, in light of this Court's granting of summary judgment to the Defendants on the Title VII claims, retaining pendent jurisdiction is unwarranted. The caselaw in this circuit clearly establishes that "when state and federal claims are joined and the federal claims are dismissed before trial, the state claims should ordinarily be dismissed as well."

---

**5.** Plaintiff withdrew his administrative DCHRA complaint before the adjudicative phase began.

*Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963, 970 (D.C. Cir.1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978). Moreover, in the instant case this Court believes that Plaintiff is attempting to expand the scope of the state law claims he relies upon and accordingly his claims are more appropriately suited for adjudication in the local court. There is no legitimate federal interest in retaining jurisdiction of these claims.

It hereby is

ORDERED that Defendants' Motion for Summary Judgment on the Title VII claims be, and the same hereby is, GRANTED; and it is further

ORDERED that Plaintiff's pendent state law claims be, and the same hereby are, DISMISSED without prejudice.